FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ JAN 23 2018 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                                                   :

KRISHTIAN LOPEZ,

                      Plaintiff,

             – against –

Correction Officer RICARDO MARTINEZ,

                      Defendant.

------------------------------------------------------------ X

**MEMORANDUM DECISION AND ORDER**

15-cv-999 (AMD) (RLM)

**ANN M. DONNELLY**, District Judge.

The plaintiff initiated this civil rights action on February 26, 2015, pursuant to 42 U.S.C. § 1983 *et seq.*, alleging excessive use of force, as well as violations of the New York State Constitution and New York State common law, against the City of New York, Corizon Health Inc. ("Corizon"), and individual corrections officers. (ECF No. 1.)[1] The plaintiff filed an amended complaint on April 5, 2016. (ECF No. 22.) The plaintiff withdrew his claims against Corizon, and filed a second amended complaint on August 29, 2016. (ECF No. 40.) On November 4, 2016, the plaintiff withdrew his state law claims and discontinued his action against the City of New York. (ECF No. 49.) On April 3, 2017, I held a bench trial on the remaining Section 1983 excessive use of force claim against an individual corrections officer, Ricardo Martinez. Six witnesses testified, including the plaintiff, Corrections Officer Steve Carpenter, Captain Tiana Diaz, Drs. Zulfiquar Bhuiyan and Budd Heyman, and the defendant, Corrections Officer Ricardo Martinez. The issue at trial was whether the plaintiff established by a

---

[1] This case was initially assigned to the Honorable John Gleeson. It was reassigned to me on December 22, 2015.

1

preponderance of the evidence that Officer Martinez used excessive force against him.[2]

The parties submitted proposed findings of fact and conclusions of law on June 20, 2017. (ECF Nos. 79, 80.) For the reasons that follow, I conclude that the plaintiff has failed to prove by a preponderance of the evidence that the defendant used excessive force against him.

## FINDINGS OF FACT[3]

The parties agree about certain facts. Broadly, they agree that the plaintiff sustained a broken jaw that required surgery, that he sought medical attention for that injury on September 1, 2014, and that over a period of a few weeks he told medical professionals that he was hurt during a basketball game.[4] The parties also agree that the plaintiff did not notify Department of Corrections officials of the alleged assault until October 17, 2014, through a notice of claim letter from the plaintiff's attorney. (Def. Ex. M.) There is no dispute that the plaintiff did not identify the defendant until about a year and a half after the injury, when the plaintiff filed his amended complaint on April 5, 2016. The following facts also are largely undisputed.

In August of 2014, the plaintiff was an inmate at Rikers Island assigned to the Otis Bantum Correctional Center ("OBCC") housing. (Tr. 14.) On September 1, 2014 at approximately 8:00 am, the plaintiff called his girlfriend; the call lasted about fifteen minutes. (Def. Ex. I.) Throughout the day, the plaintiff made additional calls to his girlfriend; the last call at 8:10 pm lasted for several minutes.[5] (Id.) A few minutes later, around 8:15 pm, the plaintiff told Corrections Officer Steve Carpenter that his jaw hurt, and that he needed medical attention. (Tr. 45-46.) Officer Carpenter filled out an injury report, which stated that the plaintiff was hurt

---

[2] I denied the defendant's motion for a directed verdict. (Tr. 235-37, 272.)
[3] The findings of fact are based on my review of the entire record, including the trial, and observations of the witnesses who testified.
[4] As discussed further below, the plaintiff claims that the first person he told that a corrections officer assaulted him was his girlfriend, on September 12, 2014. (Tr. 70-71.)
[5] In total, the prison call log reflects that the plaintiff made 11 calls that day to his girlfriend, but only 4 calls lasted for any meaningful duration. (Def. Ex. I)

2

playing basketball the previous day. (Pl. Ex.4 at DE284.)[6] Carpenter also called Captain Tiana Diaz, who escorted the plaintiff to the Rikers Island clinic. (Tr. 52, 141-42, 165-66.)

The medical notes from the clinic reflect that the plaintiff was hurt playing basketball, that the "[r]ight side of [his] face" was "mildly swollen and tender," and that he did not lose consciousness as a result of his injury. (Pl. Ex. 4 at DE294; Def. Ex. A at DE088-089.) The plaintiff was prescribed medication, and told to return the next morning for x-rays. (Tr. 55-56; Def. Ex. A at DE088-089.) X-rays taken the next morning revealed that the plaintiff's jaw was fractured; the plaintiff reported to the treating physician that he was "elbowed in the face by another inmate" while playing basketball. (Def. Ex. A at DE086.) Later that day, the plaintiff was admitted to Bellevue Hospital, where medical records reflect that the plaintiff said he was "hit in the jaw" playing basketball two days earlier, on August 31st. The records noted "swelling" on the right side of the plaintiff's face, and that he could open his mouth "partially." (Pl. Ex. 4 at DE294; Def. Ex. C at P004.) The next day, on September 3, 2014, records show that the plaintiff had "significant swelling" on the right side of his face, a "fissure" in his lower gum, "some bleeding," and a "fracture" to his jaw. (Def. Ex. C at P016-17.) That same day, Dr. Budd Heyman examined the plaintiff and wrote in his medical notes that the plaintiff "[s]tates he was punched in the face by another inmate in jail," and that the plaintiff "denie[d]" that he lost consciousness. (Def. Ex. C at P026.)

The plaintiff had surgery on his jaw on September 11, 2014, and the surgeon put a metal bar with wires and screws in the plaintiff's mouth to keep his jaw properly aligned. (Tr. 68, 221-22; Def. Ex. C at P144-48). He was discharged the next day and assigned to the Rikers Island

---

[6] The injury report did not describe the injury or note the plaintiff's physical appearance. (Tr. 142; Pl. Ex. 4 at DE284.)

3

infirmary for the next few months. (Tr. 75, 78; Pl. Ex. 2 at DE268.)[7]

At some point during the plaintiff's stay at the infirmary, he retained legal counsel. On October 22, 2014, the plaintiff's attorney sent a letter to the New York City Department of Correction ("DOC"), alleging that a corrections officer assaulted the plaintiff on September 1, 2014 at about 10:50 pm.[8] The letter described the assailant as "Hispanic or white," "about 6 feet tall," weighing about "250 pounds," and claimed that the officer was "agitated that it took [the plaintiff] longer than expected to lock up for the night and struck [the plaintiff] in the face breaking his jaw in 3 [ ] places." (Def. Ex. L.) Counsel also wrote that the plaintiff "fainted as a result of this assault," and that when he "came to he was in severe pain and bleeding from the mouth." (*Id.*) Counsel went on to say that the plaintiff did not report the incident immediately because he was "very much afraid" and "fear[ed] retaliation and further assault." (*Id.*)

On October 30, 2014, the infirmary staff reported the alleged assault to the DOC Investigation Division ("DOC ID"), which began an internal investigation.[9] (Tr. 119; Pl. Ex. 9 at DE616.) The investigator interviewed witnesses, including the plaintiff and Officer Martinez, reviewed medical records and photographs, and listened to the plaintiff's phone calls – including the plaintiff's calls to his girlfriend – from September 1, 2014.[10] The investigator also

---

[7] On both September 21 and 24, 2014, the plaintiff's gums started bleeding. (Tr. 82-83, 224; Pl. Ex. 2 at DE209-10; Def. Ex. C at DE022-023.) On both occasions, the plaintiff was taken to the Rikers Island clinic to stem the bleeding. (Tr. 83-86; Def. Ex. A at DE022-023, DE034-036; Def. Ex. L at DE695.)

[8] The plaintiff's allegation about the date of the injury changed throughout the litigation. In the letter to DOC on October 17, 2014, the notice of claim letter on October 22, 2014, and in the initial complaint, filed on February 26, 2015, plaintiff's counsel said that the alleged incident occurred on September 1, 2014. (Def. Ex. L; Def. Ex. M; Def. Ex. Q.) About eight months later, the plaintiff submitted two affidavits, each of which stated that the incident occurred on August 31, 2014. (Def. Ex. O; Def. Ex. P.) Five months later, on April 5, 2016, the plaintiff's amended complaint again stated that the incident occurred on September 1, 2014. (Def. Ex. R.) Finally, a few months later, the plaintiff filed his second amended complaint, which changed the date of the incident to August 31, 2014. (Def. Ex. S.)

[9] The plaintiff testified that he did not personally contact the Investigation Division to report the assault, although he acknowledged that he "could have." (Tr. 119.)

[10] According to the report, on one of the September 1st phone calls, the plaintiff's girlfriend asked "why he was involved in a fight." The plaintiff responded, "No! I told you, I was playing basketball," and said that he did not want to "discuss the incident on the phone." (Pl. Ex. 9 at DE617.)

photographed the plaintiff's injuries. The investigator was "unable to substantiate" the plaintiff's account of his injury, or conclude that the defendant "used force." (Pl. Ex. 9 at DE619.)

On November 5, 2014, the plaintiff had a follow-up appointment at the Rikers Island clinic with Dr. Bhuiyan. (Pl. Ex. A at DE600.) According to Dr. Bhuiyan's notes, the plaintiff "denie[d] depression or self[-]injurious behav[ior]." (Tr. 129-30; Def. Ex. A at DE600.) Five days later, however, on November 10, 2014, the plaintiff complained of "difficulty sleeping," depression, and "PTSD" from the alleged assault, so the clinic referred him for mental health treatment. (Tr. 128; Def. Ex. A at DE537.)

The parties disagree about other facts, most obviously how the plaintiff's jaw was broken, and by whom. The plaintiff testified that the defendant hit him in frustration because the plaintiff would not follow his orders. Specifically, the plaintiff testified that on August 31, 2014, at 11:00 pm, the defendant directed him and other inmates to "lock in" for the night. (Tr. 24-26.) The plaintiff was "being bad" and "wasn't really trying" to follow the defendant's order. (Tr. 24.) Other inmates were also ignoring the defendant, but the defendant focused on the plaintiff; the defendant, according to the plaintiff, "was angry . . . [because] he wanted to go home." (Tr. 26-27.) At this point, the plaintiff was "out halfway in [his] cell," not facing the defendant, but standing with his right side toward the defendant. Suddenly, the plaintiff felt himself being punched with such force that he lost consciousness. (Tr. 28-29.)[11] He revived after a few minutes, and found that he was lying on his bed. (Tr. 31.)[12] The plaintiff looked in the mirror, and saw that his mouth was "swollen" and looked "crazy . . . one side was up, one side was down." His gum was "split," and there was "a lot" of blood not only on him, but on the cell floor

---

[11] Medical records indicate that the plaintiff weighed 116 pounds and was 5 feet, 7 inches tall. (Def. Ex. C at P010.)
[12] The plaintiff did not actually see the defendant punch him, but said that the defendant was the "only one there talking to [him]." (Tr. 29, 125.)

5

and his pillows. (Tr. 30, 33-34.) The plaintiff tried unsuccessfully to close the wound in his gum with the "string" from a towel. (Tr. 34-35.) Although the plaintiff said he was in "a lot of pain," (Tr. 31), he did not alert anyone that he was injured or seek medical attention because he feared retaliation from the officers, who "control[led] everything." He then fell asleep. (Tr. 31-32, 35.)

The plaintiff woke up the next day, on September 1st. He skipped breakfast, lunch, and dinner, because his jaw was "all swollen up" and "some of [his] teeth w[eren't] hitting each other" and were not "grinding." (Tr. 42.) He could not move his mouth, and his jaw was "hanging." (Tr. 108.) The plaintiff's mouth did not bleed as long as he did not talk or move it, but if he "tried to move it or do anything it opened back up." (Tr. 42.) Nevertheless, the plaintiff called his girlfriend twice – once in the morning and once later in the afternoon. (Tr. 37, 44; Def. Ex. I.) Officers on the floor and in the control room could see him at the telephones, but the plaintiff "covered" his injury by not opening his mouth. (Tr. 109-10.)

Later that night, there was still "a lot of blood" in the plaintiff's mouth, and the "whole right side of [his] face was swollen and [the] left part of [his] jaw was down." At about 8:00 pm, he asked Corrections Officer Steve Carpenter, who he thought "seem[ed] like a good guy," for medical attention. (Tr. 46-47.)

According to the plaintiff, Carpenter called Captain Diaz, who wrote him a "pass" so that he could go to the clinic by himself. (Tr. 48-49.) The infirmary staff turned him away because he had no escort. (Tr. 50-51.) Thereafter, Diaz escorted the plaintiff to the medical clinic. (Tr. 141-42, 165-66.) At the clinic, the plaintiff reported that he got hurt playing basketball; he told this story because a corrections officer was "right next" to him. (Tr. 53.) According to the plaintiff, the doctor "didn't believe" his basketball story, and "went and told the other officers . . . this guy says he got hurt playing basketball," and showed the officers the plaintiff's face. (Tr.

6

54.) Another doctor also saw the plaintiff and prescribed medication. (Tr. 55.)

On September 3, 2014, the plaintiff went to Bellevue Hospital, where he also told the staff that he was injured playing basketball; once again, he told this story because corrections officers were always within earshot. (Tr. 58-59, 61-62.) He admitted, however, that no officers were present when Dr. Budd Heyman examined him. (Tr. 107.) The plaintiff denied telling Dr. Heyman that an inmate punched him, and did not remember saying that he did not lose consciousness, although he conceded that the doctor's record about other aspects of his medical history and medications was accurate. (Tr. 104-07.) Up to this point, the plaintiff had told nine people that he was injured playing basketball. (Tr. 134.)

The first person to whom the plaintiff confided that a corrections officer punched him was his girlfriend, who visited him at Bellevue the day after his surgery on September 12, 2014.[13] He felt comfortable telling his girlfriend what happened because there were no corrections officers in the room when she visited. (Tr. 71, 107.) About a week after that conversation, the plaintiff told his father about the assault, not in the hospital, but in the Rikers Island infirmary visitation area; the plaintiff said it was "too noisy" for corrections officers to hear his conversations. (Tr. 74.) Shortly thereafter, the plaintiff's family retained counsel to represent him. (Tr. 89-90.)

On November 5, 2014, the plaintiff had an appointment with Dr. Bhuiyan, when he told that he was not depressed. (Tr. 129-30.) Nevertheless, on November 10, 2014, the plaintiff visited a mental health provider claiming "PTSD . . . sleeping disorder, [and] depression," as well as "flashbacks" in which he saw "the officer hitting" him. (Tr. 78.)

Corrections Officer Steve Carpenter, Captain Tiana Diaz, and Drs. Heyman and Bhuiyan

---

[13] The plaintiff initially said that this conversation took place during a telephone call, (Tr. 69-70), but later testified that he did not speak to anyone about the incident over the phone. (Tr. 72.)

7

also testified. Officer Carpenter had no independent recollection of his encounter with the plaintiff, but confirmed that he had prepared the initial report in which the plaintiff said he was hurt on August 31st playing basketball. (Tr. 139; Def. Ex. D.)

Captain Diaz testified that the plaintiff told her he was injured while playing basketball, and while she recalled that the plaintiff said he injured his mouth, she did not recall seeing any bruises or blood on the plaintiff. (Tr. 169.) On September 1st, Diaz asked the plaintiff about his injury. The plaintiff refused to give a written statement, but told Diaz, "I got hit in the mouth playing basketball yesterday. I'm sorry, I thought it would get better. It's not. I think it's infected." (Def. Ex. F.) Because the plaintiff claimed he was hurt playing basketball on August 31st; Captain Diaz looked at footage from the recreational area and checked the recreation area logbook for that date, but found nothing. She also spoke to other inmates, all of whom said they did not see anything, and all of whom refused to sign statements.[14] (Tr. 187-197; Def. Ex. Y.)

Dr. Budd Heyman, a board-certified physician and director of prison health services at Bellevue, examined the plaintiff and took a medical history, which included questions about how he sustained his injury. (Tr. 264-65.) As noted above, the doctor's notes reflect that the plaintiff told him that another inmate hit him.[15]

Dr. Zulfiquar Bhuiyan examined the plaintiff at the Rikers Island clinic after his surgery. He explained that doctors do not share patient records with officers, and that corrections officers were not present during examinations, unless the inmate was violent. (Tr. 230-34.)

The final witness was the defendant, who denied assaulting the plaintiff or any inmate.[16]

---

[14] Diaz characterized the inmates' refusals to sign statements as a "brush off." (Tr. 200.)
[15] Dr. Heyman said that he generally used quotation marks to signify a patient's verbatim statements, and that his notes about the plaintiff's injury – that the plaintiff was punched in the face by another inmate – did not contain quotation marks. (Tr. 267-68.)
[16] On cross-examination, counsel asked the defendant about his deposition testimony that he could not say with 100% certainty that he did not hit the plaintiff, because he "d[idn't] know who [the plaintiff was]." (Tr. 244-45.)

8

On August 31, 2014, the defendant was working on the OBCC floor. (Tr. 240.) By 11:00 pm, all the inmates were in their cells "without incident." If an inmate had been "goofing off," the defendant would have notified the "control room officer" and contacted the area supervisor. (Tr. 241, 255, 259.) The consequence to an inmate for fooling around during lock in would have been "at the most" an infraction. (Tr. 255.) An officer involved in a use of force incident would be required to complete a use of force report, but would receive overtime compensation if completing the report required working longer than a normal tour of duty. (Tr. 260-61.)

## DISCUSSION

A court considering a motion under Rule 52(c) "acts as both judge and jury" and "weigh[s] the evidence, resolv[es] any conflicts, and decid[es] where the preponderance lies." *In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998). To establish a fact by a preponderance of evidence means "simply to prove that the fact is more likely true than not true." *U.S. v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *see also Velasquez v. United States Postal Service*, 155 F.Supp.3d 218, 227 (E.D.N.Y. 2016). A judgment for the defense under Federal Rule 52(c) is appropriate when a plaintiff fails to make out a *prima facie* case or where the plaintiff fails to prove his claims by a preponderance of the evidence, *see* Fed. R. Civ. P. 52(c) advisory committee notes, *see also LaMarca v. United States,* 31 F.Supp.2d 110, 123 (E.D.N.Y. 1998); *Stokes v. Perry*, US Dist. Lexis 20197 (S.D.N.Y. 1997) (citations omitted), and "operates as a decision on the merits in favor of the moving party." *In re Regency Holdings (Cayman), Inc.*, 216 B.R. at 375.

To establish a claim under 42 U.S.C. § 1983, a plaintiff must allege that "(1) the conduct complained of was committed by a person acting under color of state law, and (2) this conduct

---

The defendant explained that he "misspoke," and that when he gave that testimony he was looking at a photograph of the plaintiff, whom he did not recognize.

9

deprived a person of rights, privileges or immunities secured by the Constitution or law of the United States." *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency*, 77 F.3d 26, 29-30 (2d Cir. 1996) (internal quotation marks and citations omitted). "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Ali v. Szabo*, 81 F.Supp.2d 447, 462 (S.D.N.Y. 2000) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994), and collecting cases) (internal quotation marks and citations omitted). Therefore, to substantiate his claim, the plaintiff must show that the defendant did something that caused the plaintiff to lose a federal right. *Brown v. Coughlin*, 758 F.Supp. 876, 881 (S.D.N.Y. 1991) (citing *Monell v. Dep't. of Social Serv.*, 436 U.S. 658 (1978)); *Royster v. Koehler*, No. 89-cv-2403-KTD, 1991 WL 84668, at *2 (S.D.N.Y. May 14, 1991) (internal citations omitted).

In this case, the plaintiff has the burden of establishing by a preponderance of the evidence that he sustained an injury, and that the defendant caused the injury – specifically, that the defendant punched him in the face, and that the force was excessive. In my judgment, the evidence did not meet this standard. While the plaintiff undoubtedly suffered a significant injury, as evidenced by the credible and comprehensive medical records, there is insufficient evidence that it was the defendant who caused that injury.

A court sitting as the finder of fact must evaluate the witnesses and determine the appropriate weight to accord each witnesses' testimony, *see Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012), and must "determine which of the witnesses it finds credible, which of the permissible competing inferences it will draw, and whether the party having the burden of proof has persuaded" it that the facts are proven. *U.S. v. N.Y. Fish, Inc.*, 10 F.Supp.3d 355, 362 (E.D.N.Y. 2014) (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 215 (2d Cir.2001)) (internal quotation

marks and citations omitted).

As an initial matter, even when a plaintiff's testimony is credible, if the defendant is equally credible, and the evidence is otherwise neutral, the evidence is equal, and thus the party with the burden of proof loses. *See Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 730 (2d Cir. 2001); *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd.*, No. 06-cv-3972-AJN, 2013 WL 5718447, at *10 (S.D.N.Y. Oct. 21, 2013). In this case, I find that the plaintiff was not entirely credible, and that the evidence did not corroborate his claims.

I credit the testimony of the following witnesses: Officer Carpenter, Captain Diaz, and Drs. Bhuiyan and Heyman. None of these witnesses had any demonstrable motive to lie, their testimony was consistent and corroborated by the evidence, and their demeanor did not suggest that they were lying or being evasive. I also credit the defendant's testimony for most of the same reasons. I do not credit aspects of the plaintiff's testimony, which I discuss below.

The evidence establishes, and the plaintiff concedes, that for weeks after he was injured, he maintained that his jaw was broken during a basketball game, or, as he told Dr. Heyman, by another inmate.[17] This was the story that he told not only to corrections officers, but to medical professionals, whom he had no reason to fear. I do not credit his testimony that he lied to the doctors because corrections officers were either in the room during examinations or within earshot, and that he feared retaliation from them. First, the plaintiff's own testimony on this subject was inconsistent; he admitted that there were no officers in the vicinity when he spoke

---

[17] The plaintiff claims that the doctor's notes on this point are not reliable, because he did not use quotation marks. The absence of quotation marks in Dr. Heyman's report does not strike me as particularly meaningful, since there is no evidence that the doctor was sloppy or careless in describing his conversation with the plaintiff; it simply means that he did not quote the plaintiff word for word. In any event, the plaintiff's statement that another inmate hit him is not obviously inconsistent with his story that he was injured playing basketball.

with Dr. Heyman, or when he met with his girlfriend at Bellevue. Second, the credible witnesses, including Drs. Heyman and Bhuiyan, testified that corrections officers were not present during examinations (unless, as Dr. Bhuiyan said, the inmates posed a risk to the examiner, which was not an issue in this case), and that the officers would not have access to a patient's records. Moreover, the plaintiff apparently felt comfortable enough in the Rikers Island visiting area to tell his father that a corrections officer hit him. And, of course, he was still at Rikers Island after he filed his lawsuit, and thus still presumably vulnerable to retaliation by corrections officers.

The details of the plaintiff's account of both the incident and its aftermath were also inconsistent and at times illogical. According to the plaintiff, the defendant punched him out of frustration, because the plaintiff's refusal to follow the defendant's order was keeping the defendant from going home. There is no evidence in the record to support this claim. The defendant testified that he would have received overtime compensation if he had stayed late to fill out a use of force report. Moreover, the defendant said that if a plaintiff were "goofing off," he would have contacted other officers to assist, and "at the most" given the plaintiff an infraction. The plaintiff's description of the punch itself was also contradicted by other evidence. The plaintiff said that the defendant punched him without warning, not from the front, but from the side, with such force that the plaintiff lost consciousness and then awoke to find himself lying on his bed, covered in blood. But the plaintiff denied to doctors that he lost consciousness. And while he described his injuries in graphic terms – that his face was "swollen up," his jaw was "hanging," and he was in "[a] lot of pain," he also admitted that he was able to go to sleep for the night, and that when he woke up the next day, to carry on at least two telephone conversations with his girlfriend, which lasted for a combined total of more than 25

minutes. He made these calls in full view of other corrections officers, none of whom apparently noticed the dramatic injuries that the plaintiff alleged. Captain Diaz did not see any blood or bruising on the plaintiff's face, and the September 1st medical records reported that the plaintiff's jaw was only "mildly swollen."

The plaintiff's claims about his mental health are also not entirely credible. Notably, it was not until after the plaintiff filed this lawsuit that he complained of depression and PTSD as a result of the alleged assault. As Dr. Bhuiyan's medical notes confirm, the plaintiff "denie[d] depression or self injurious behave[ior]" as late as November 5, 2014, more than two months after he sustained the broken jaw. It was not until November 10th that the plaintiff claimed that he was depressed.[18]

Equally problematic was the plaintiff's evolving description and identification of his assailant. In the October 22nd letter to the DOC, the plaintiff's assailant was described as white or Hispanic, over six feet tall, and 250 pounds; there is no evidence in the record about the defendant's height or weight, but he appeared to me to be far slimmer than 250 pounds, and under six feet.[19]

I also consider the plaintiff's criminal record, which reflected poorly on his credibility. Of course, the mere fact of a criminal record does not mean that the plaintiff is not believable. Here, however, the crime for which the plaintiff was convicted – threatening a witness in his

---

[18] The plaintiff's explanation for this disparity – that he denied that he was depressed only to avoid a trip to Bellevue – is not especially convincing, given his earlier refusals to go to Bellevue.

[19] The plaintiff's pleadings further undercut his credibility. *See Savino v. Computer Credit, Inc.*, 960 F.Supp. 559, 602 (E.D.N.Y. 1997) ("[P]rior complaints may be used to impeach the credibility of the plaintiff."). The plaintiff alleged in his complaint and amended complaint that he "begged a number of correctional officers he encountered for assistance," and "[e]ach and every guard told plaintiff over and over again, '[n]o . . . I don't want to have anything to do with this.'" (ECF No. 1 at 10; ECF No. 22 at 10-11.) The plaintiff's second amended complaint did not include this allegation, and at trial, the plaintiff said that he did not tell anyone what happened or seek medical attention, because he "was scared," and because "the COs . . . control[led] everything." (ECF No. 40 at 3; Tr. 31-32.) *See also U.S. v. GAF Corp.*, 928 F.2d 1253, 1259 (2d Cir. 1991) ("the law is quite clear that superseded pleadings in civil cases may constitute admissions of party opponents . . . .").

brother's murder trial – reflects the plaintiff's willingness to put his interests over the community's, and is thus relevant to his credibility. His attempt to minimize his conduct by claiming that he did not actually threaten the witness was obviously inconsistent with his plea, and was not persuasive.

In contrast, the substance of the defendant's testimony was credible. He was not evasive or defensive, even in the face of aggressive cross-examination by able counsel.[20] Moreover, his testimony that he did not assault the plaintiff was corroborated by other evidence, most notably the plaintiff's repeated statements that he was injured not by a corrections officer, but in a basketball game.

In short, the plaintiff did not establish his claim by a preponderance of the evidence.

## CONCLUSION

For the foregoing reasons, the plaintiff has failed to establish his Section 1983 claim by a preponderance of the evidence. I therefore find in favor of the defendant, and dismiss the plaintiff's claim with prejudice.

SO ORDERED.

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
      January 23, 2018

---

[20] The plaintiff stresses the discrepancy between the defendant's response during his deposition – that he "d[idn't] know" if he hit the plaintiff – and trial testimony, that he was *certain* he did not hit the plaintiff. I credit the defendant's explanation that he "misspoke" at his deposition, and he was at that point trying to sort out who the plaintiff was.